UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHAWMUT CORPORATION,
Plaintiff and Defendant in
Counterclaim,

v.

No. 22-cv-11651-DLC

FXI, INC.,
Defendant and Plaintiff
in Counterclaim.

**MEMORANDUM AND ORDER ON FXI, INC.'S MOTION FOR SUMMARY JUDGMENT**

**CABELL, U.S.M.J.**

**I. INTRODUCTION**

In the automobile parts industry, manufacturers sell automobile components of parts to other manufacturers and sellers of components. The process ultimately results in a completed part that is installed in an automobile. This breach of contract dispute is between two such manufacturers. The defendant FXI ("FXI") manufactured and sold polyurethane foam to the plaintiff Shawmut Corporation ("Shawmut"). Shawmut, which manufactures components that include polyurethane foam, asserts that FXI breached the parties' Supply Agreement by providing defective foam and by prematurely closing FXI's New Jersey facility that

manufactured the foam.[1]   In a counterclaim, FXI submits that, having reconciled the defective foam claims and applied the amount to Shawmut's outstanding balance, Shawmut breached the Supply Agreement by not paying this outstanding balance.

FXI presently moves for summary judgment on Shawmut's breach of contract claim and implied duty of good faith and fair dealing ("duty of good faith") claim as well as on FXI's counterclaims for breach of contract, breach of the duty of good faith, and unjust enrichment.   For reasons that follow, the summary judgment motion (D. 41) is denied.

## II.  **THE PARTIES' ARGUMENTS**

In seeking summary judgment on Shawmut's breach of contract claim based on defective foam,[2] FXI argues that:  (1) Shawmut fails to provide expert testimony that the polyurethane foam was defective and that any defect caused Shawmut damages (D. 42, pp. 1, 9-10); and (2) Shawmut's intentional destruction of the allegedly defective foam, i.e., spoliation, warrants dismissing the claim (D. 42, pp. 10-12).  Shawmut responds that: (1) expert testimony is not required because the defects, such as the discoloration, thickness, and smoothness of the foam, are within

---

[1] Shawmut raises this twofold assertion in a single breach of contract count in the two-count complaint.

[2] The court focuses on the breach of contract claim and only briefly discusses the duty of good faith claim.  This accords with FXI's treatment in its supporting memorandum.  FXI relegates its argument regarding the duty of good faith claim to a footnote.  (D. 42, p. 19, n.3).

the fact finder's lay knowledge (D. 46, pp. 18-19); and (2) there was no spoliation because FXI inspected the defective foam or Shawmut offered FXI the opportunity to inspect it (D. 46, pp. 16-17).

On Shawmut's breach of contract claim based on closing the New Jersey facility, FXI asserts that: (1) a limitation of liability in FXI's invoices precludes consequential damages, thus preventing Shawmut from recovering damages for: (a) FXI's closure of the East Rutherford, New Jersey facility ("ER facility"); and (b) the loss of business with Grupo Antolin Kentucky, Inc. ("Grupo"), which purchased Shawmut's product that included FXI's foam (D. 42, pp. 12-13); (2) the Supply Agreement did not make FXI responsible for the costs Shawmut incurred resulting from FXI's closure of the ER facility ($763,847) because FXI's only obligation was to provide the foam that Shawmut ordered (D. 42, p. 15); and (3) even if the Supply Agreement required FXI to pay these costs, FXI did not breach the Supply Agreement by closing the ER facility because the parties' subsequent conduct modified or Shawmut waived any such obligation in the Supply Agreement (D. 42, pp. 15-17).

In opposition, Shawmut maintains that: (1) the limitation of liability in FXI's invoices is not in the Supply Agreement (D. 46, pp. 14-16); (2) Shawmut's purchase orders, which preceded the invoices, made FXI's shipments an acceptance of Shawmut's supply manual, which, in turn, made FXI responsible for *all charges*

incurred as a result of FXI's non-conforming foam (D. 46, p. 14) (D. 47, ¶¶ 12-13); (3) there was no waiver because a waiver requires clear, decisive, and unequivocal conduct and there was none (D. 46, pp. 20-21); and (4) there was no modification because Shawmut did not consent to a modification and there was no consideration exchanged for any such modification (D. 46, pp. 20-21).

In moving for summary judgment on the counterclaims, FXI's argument is relatively brief. FXI submits that Shawmut did not pay an outstanding amount that it owed to FXI ($58,066.65). The amount, per FXI's calculations, accounted for all of Shawmut's defective foam claims. In opposition, Shawmut maintains that the amount is incorrect. (D. 44-2, pp. 263-264). Moreover, even if FXI is correct, Shawmut overpaid FXI and has a right to offset the amount, per Shawmut's argument. (D. 46, pp. 21-22).

## III.  **LEGAL STANDARD**

Entitlement to summary judgment requires the movant to show "there is no genuine dispute as to any material fact." *Dusel v. Factory Mut. Ins. Co.*, 52 F.4th 495, 503 (1st Cir. 2022) (citation omitted). If the movant is "able to make a showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party, who must, with respect to each issue on which [he] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor."

*Id.* (citation omitted); *see Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) ("[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment . . . .") (citation omitted).   The record, including all reasonable inferences, is viewed in favor of the nonmovant.  *See Motorists Com. Mut. Ins. Co. v. Hartwell*, 53 F.4th 730, 734 (1st Cir. 2022). In accordance with this standard, the facts are as follows.

**IV.  BACKGROUND**

**A.  The Automobile Supply Industry**

Automobile manufacturers of components that eventually lead to a completed part typically do not acquire or store large quantities of inventory.  This allows them to avoid unnecessary storage costs.  (D. 47, ¶ 3).  Thus, they operate in what is known in the industry as "just in time" supply chain management.  Simply stated, they order, buy, sell, and ship materials only as needed. (D. 47, ¶ 3).  Hence, if a single supplier[3] fails to provide a component on a timely basis, the upstream supplier may incur delays and associated costs.  (D. 47, ¶ 3) (D. 44-2, p. 232).[4]

---

[3] For consistency, the court refers to suppliers as opposed to manufacturers in the *supply* chain.

[4] Page numbers in a docket entry citation refer to the page number in the upper righthand corner of the docketed filing except for citations to depositions. Page numbers cited for depositions refer to the deposition page.

Suppliers buying and selling component parts from each other ordinarily have a contract. Such contracts typically require the "seller to produce materials on short notice and for a negotiated price[.]" (D. 47, ¶ 4). In exchange, the buyer agrees "to buy substantially all of its requirements for the specified" materials from that seller.[5] (D. 47, ¶ 4).

The manufacturer that purchases the completed component part at the end of the supply chain is referred to as the original equipment manufacturer ("OEM"). (D. 48, SOF 2).[6] For example, Ford Motor Company is an OEM. (D. 48, SOF 3).

The supply chain leading to this final purchase operates in tiers. Typically, the OEM manufacturer buys the automobile component part from a Tier 1 supplier, who in turn purchases a component part for its product from a Tier 2 supplier, who

---

[5] The parties dispute whether the Supply Agreement was a requirements contract or a satisfaction agreement. To briefly explain, FXI contends the Supply Agreement was a satisfaction agreement wherein a party agrees to perform to the satisfaction of the opposing party. (D. 50, p. 6). Further, because the Supply Agreement was a satisfaction agreement, FXI maintains it did not breach the Supply Agreement. (D. 50, p. 7). To prove this point, FXI relies on an unpublished Michigan state court case, *Johnson Controls, Inc. v. Atlantic Auto. Components, LLC*, Docket No. 321172, 2015 WL 5945382, at *6 (Mich. App. Oct. 13, 2015) (unpublished). To be sure, the satisfaction agreement in *Johnson* has similarities with the Supply Agreement, but it also has differences. Of note regarding differences, the satisfaction agreement "could be terminated in [the tier one supplier's] sole discretion as long as the termination decision was not made in bad faith." *Id*. In contrast, the Supply Agreement automatically renewed annually on September 30 unless a "party receive[d] written termination notice . . . at least 90 days prior to the end of the current term." (D. 44-3, ¶ 6.a). In any event, putting aside nomenclature as to a satisfaction or requirements agreement, it is the *terms* of the Supply Agreement that are material and control the parties' contractual relationship.

[6] "SOF" refers to an undisputed statement of fact in Shawmut's response to FXI's statement of facts.

purchases a component part from a Tier 3 supplier.  (D. 48, SOF 4); *see* (D. 44-2, pp. 37-38, 64-65).

## B.  <u>The Parties' Relationship</u>

Shawmut's and FXI's relationship began in or around 1990. (D. 44-2, p. 69).  Prior to the January 2018 Supply Agreement, Shawmut purchased FXI's foam to meet Shawmut's parameters, such as width and thickness, set out in purchase orders.  FXI agreed to meet the requirements in the purchase orders and to provide foam that complied with technical data sheets established by FXI detailing the foam's physical properties.  (D. 47, ¶ 7) (D. 44-2, pp. 68-69, 72-73).  Stated briefly, Shawmut would issue a purchase order, whereupon FXI would ship the foam and issue an invoice. (D. 44-2, p. 68).

Throughout, FXI was a Tier 3 supplier which sold the foam to Shawmut, a Tier 2 supplier.  (D. 48, SOF 6) (D. 44-2, p. 236). Shawmut incorporated the foam into its component part, namely, headliners.  (D. 47, ¶ 2).[7]  Headliners are upholstered padding which are adhered to the interior of an automobile, such as in

_____

[7] The above-cited affidavit by the Vice President, Business Operations for Shawmut is somewhat inconsistent regarding whether Shawmut sold headliners or headliner fabric to Grupo.  Paragraph two states, "Shawmut has provided materials to the automobile industry, including a component called a 'headliner.'"  (D. 47, ¶ 2).  In contrast, paragraph six states that Shawmut "sells headliner fabric composites to Tier 1 entities . . . ."  (D. 47, ¶ 6). The distinction is immaterial.  Whether Shawmut sold headliners or headliner fabric, the primary issues in this case are the defects, if any, in the foam supplied by FXI and the closure of the ER facility that produced that foam. For consistency, the court refers to headliners as opposed to headliner fabric.

door panels.  (D. 47, ¶ 2) (D. 44-2, p. 249).  Headliners have three main components:  an outer layer of thin fabric, a layer of polyurethane foam, and a rigid base.  (D. 47, ¶ 2).  Shawmut then sold the headliners to a Tier 1 supplier.  (D. 47, ¶ 6).  One of those Tier 1 suppliers was Grupo.  (D. 47, ¶ 6).  Grupo encapsulated Shawmut's headliners into its product, which it then sold to Ford. (D. 44-2, p. 37).

In short, Ford was the OEM, Grupo was the Tier 1 supplier, Shawmut was the Tier 2 supplier, and FXI was the Tier 3 supplier. Shawmut had contracts with both FXI and Grupo anent supplying the polyurethane foam.  (D. 44-2, p. 236).

## C.  <u>The Supply Agreement</u>

On January 1, 2018, Shawmut and FXI executed the Supply Agreement effective through September 30, 2020.  Per the terms of the agreement, it renewed automatically for "one year periods thereafter, unless either party" received a "written termination notice at least 90 days prior to the end of the current term." (D. 44-3, § 6.a.).

Continuing, the Supply Agreement obligated Shawmut, "in its sole discretion," to award FXI "certain products to be used in certain OEM programs ('the Awarded Products'). . . ."  (D. 44-3, § 1.a.).  As shown in the appendices of the Supply Agreement and by the parties' subsequent conduct, the Awarded Products included polyurethane foam.  Accordingly, the Supply Agreement "commit[ted]

8

Shawmut to purchase substantially all of its requirements" for foam from FXI. (D. 44-3, § 1.a.). At the very least, the Supply Agreement obligated FXI to provide the foam Shawmut requested.[8]

Under the Supply Agreement, and consistent with the parties' prior practice, Shawmut issued blanket purchase orders to FXI with the Awarded Products. (D. 44-3, § 1.a.) (Supply Agreement stating, "Awarded Products are products designated as awarded to FXI on a blanket purchase order covering mass production requirements"); (44-3, § 1.c.) (Supply Agreement stating, "Purchase Orders shall be issued in accordance with . . . applicable conditions in place as of the date of this Agreement"). Such purchase orders identified the type of foam, and other general characteristics, such as thickness, but not the quantity of the foam.[9] (D. 48, SOF 20) (D. 44-2, pp. 76, 78-79) (D. 47, ¶ 7). Rather, as shown by the parties' conduct before and after the Supply Agreement, Shawmut issued a separate document, a release, identifying the quantity of product it needed in connection with a blanket purchase order. (D. 44-3, pp. 76-80); (D. 44-2, pp. 79-80) ("The triggering event for FXI to ship product to Shawmut would be the release requirement

---

[8] FXI implicitly acknowledges this obligation in its reply brief. FXI asserts that it did not breach the Supply Agreement by closing the ER facility because it shipped all of the products that Shawmut requested under its releases. (D. 50, p. 5).

[9] In contrast, purchase orders in the fall of 2021 identified the quantities of the foam Shawmut needed. (D. 44-21). Placed in context, Shawmut issued these purchase orders to build inventory given the anticipated closure of the ER facility.

issued against an existing purchase order."). In short, Shawmut issued a blanket purchase order and then, upon Shawmut's release issued against the purchase order, FXI would ship the quantity of foam identified in the release in the required thickness. (D. 48, SOF 8) (D. 44-2, pp. 65, 68, 78-80).

The Supply Agreement contains a critical provision regarding the defective product claims. Specifically, the agreement conditioned Shawmut's purchase of an Awarded Product, such as polyurethane foam, "upon FXI remaining competitive in terms of quality, delivery, service, technology and price, as defined in Section 1(d) below." (D. 44-3, § 1.a.). Section 1(d) defined an Awarded Product that was not competitive as "one for which service, *quality*, delivery, *physical properties*, or other aspects of performance [fell] materially short of competitive benchmarks or [did] not meet Shawmut, Tier, OEM requirements; . . . ." (D. 44-3, § 1.d.) (emphasis added). The Supply Agreement denoted such products as "[u]ncompetitive [p]roducts."

Construing the Supply Agreement, polyurethane foam was an uncompetitive product if it had material defects in quality or physical properties, such as color and thickness. *See* (D. 47, ¶ 13). Also, a prime indication of an uncompetitive product is one that a Tier 1 supplier or an OEM rejected and returned to Shawmut. (D. 44-3, ¶ 1.d.); (D. 47, ¶ 13) (FXI's "foam products had to be

delivered in a consistent color and thickness . . . Otherwise, Shawmut's customers would reject Shawmut's headliners.").

## D.   **The Parties' Process To Address Product Defects**

Shawmut and FXI developed a process to address product defects, including defects anent polyurethane foam.  (D. 47, ¶ 14).  When FXI provided purportedly defective foam that Shawmut or Shawmut's customers rejected, Shawmut notified FXI using a supplier quality notification form ("SQN").  (D. 47, ¶ 18) (D. 44-2, pp. 97-98).  Each SQN stated, "If no response is received within 72 hours, material will be scrapped and deduction taken from your account."  (D. 47, ¶ 18); (D. 47-1, p. 2); (D. 44-2, p. 22) (Shawmut's Federal Rule of Civil Procedure 30(b)(6) deponent stating, "Shawmut has a standard SQN form that it issues to suppliers").  SQNs also included a description of the defect, for example, yellowed foam.  (D. 47, ¶ 18) (D. 47-2) (D. 47-1, p. 3) (D. 44-12, p. 13).

## E.   **FXI's Refusal To Pay Product Defect Claims Resulting In  Shawmut's Damages**

If the foam lacked a consistent color or the required thickness, Shawmut's customers would reject the headliners.  (D. 47, ¶ 13).  In that regard, the Supply Agreement designated a product uncompetitive if it did not meet Shawmut's or an OEM's requirements.  (D. 44-3, § 1.d.).  Thus, foam that had material defects, such as a lack of a consistent color or the required

thickness, constituted an uncompetitive product. *See* (D. 47, ¶ 13).

Here, for example, FXI reviewed a claim that the foam had a defect of exhibiting a yellow color rather than the approved color. FXI denied the claim, leading Shawmut to incur a cost of $6,820.55. (D. 44-12, p. 12) (chart denoting nonconformance as scorched); (D. 44-12, p. 13 (chart defining scorched as foam exhibiting a yellow color); (D. 44-2, pp. 92-95) (explaining these two charts). Another example is FXI's denial of a claim that the thickness of the foam was nonconforming and resulted in Shawmut incurring a cost of $447.88.[10] In total, the outstanding credit due to Shawmut on account of defective foam since June 18, 2018 was $178,305.14. (D. 47, ¶ 20) (D. 44-12, pp. 6, 12).[11]

## F.  Closure Of ER Facility

By letter dated August 13, 2021, FXI informed Shawmut that it would close the ER facility effective December 31, 2021.[12] (D. 44-

---

[10] These claims are germane because Shawmut seeks to avoid summary judgment on the breach of contract claim because color and thickness do not require expert testimony. (D. 46, p. 19). As explained later, Shawmut is correct.

[11] Whereas FXI disagrees, the record is viewed in Shawmut's favor.

[12] The letter reads as follows:

> After a very thorough review of the current state of the business at FXI's East Rutherford Facility (the "Facility"), the Company has determined that it must now take the necessary step of closing the Facility permanently effective December 31, 2021.

> Your designated sales representative will be contacting you to further discuss your requirements over the coming months and to provide you with assistance in transferring your business to another supplier.

6) (D. 48, SOF 31).  The facility produced the majority of the foam Shawmut purchased from FXI.  (D. 48, SOF 31) (D. 47, ¶ 21). In a follow-up letter two weeks later, FXI clarified that no other FXI facility would produce the products currently manufactured at the ER facility.  Further, the facility would permanently close on December 31.  This letter also advised Shawmut that, at this time, FXI did not have any replacement products to offer Shawmut.  (D. 44-7) (D. 48, SOF 34).  Separately, the letter suggested that FXI may be able to build an inventory for Shawmut and other customers to meet their needs after December 31.

Shawmut and FXI therefore arranged for a "bank build," meaning that FXI would manufacture foam products to provide Shawmut with a cushion of available products.  (D. 48, SOF 35).  In that regard, FXI sent Shawmut a letter on October 6 stating:

> To the extent that you would like FXI to build an inventory quantity over and above those current orders for customer needs beyond December 31, **we must receive that request no later than Friday, October 15.**  Requests to build such inventories will be . . . accepted on a case-by-case basis and FXI does not guarantee that it will be able to supply additional requirements for customer needs post-December 31, 2021.  While FXI may be able to build an inventory quantity for customer needs occurring after December 31, 2021, **those quantities will have to be shipped prior to December 31, 2021.**

(D. 44-8) (D. 48, SOF 36) (emphasis original).

---

(D. 44-6).  These and subsequent communications by FXI are pertinent to whether FXI terminated the Supply Agreement and/or the parties modified the agreement or Shawmut waived its rights.

During this time, Shawmut issued releases against an existing purchase order and issued new purchase orders to build the cushion of inventory. (D. 44-2, pp. 177-178, 182) (D. 44-21). Given the surrounding circumstances, these releases and new purchase orders were an effort to create the cushion of inventory as part of the bank build. (D. 47, ¶ 24) ("Shawmut had to purchase this excess inventory to allow for enough time to introduce alternative supply without interruption to the automotive supply chain . . . ."). In mid-October, Shawmut asked FXI to extend production at the ER facility beyond the December closure date. FXI accommodated the request and extended production to February. (D. 44-2, pp. 158-159).

In November 2021, FXI and Shawmut exchanged emails and held Zoom meetings detailing their bank build efforts. (D. 48, SOF 54) (D. 44-15) (D. 44-16). The parties continued to correspond and met by Zoom in December. (D. 48, SOF 54) (D. 44-17). In early February, FXI made its last shipment of foam to Shawmut. (D. 44-2, p. 184). As of mid-February, Shawmut did not have any "releases outstanding to FXI for any regular production material[.]" (D. 44-2, p. 186). Shawmut also did not have any "purchase orders outstanding for any bank build material[.]"[13] (D. 44-2, pp. 186-

---

[13] FXI therefore argues that it did not breach the Supply Agreement. (D. 50, p. 5).

187).  Shawmut did not issue releases or purchase orders because of the anticipated closure of the ER facility.  (D. 44-2, p. 188).

## G.  Shawmut's Purported Debt To FXI Of $58,066.65

On September 22, 2022, FXI sent Shawmut a letter setting out FXI's position regarding the balance Shawmut owed it for the foam Shawmut received.  (D. 44-11).  An Excel spreadsheet totals the purported amount Shawmut owed as $58,066.65.  (D. 44-11).  The unpaid invoices used to calculate the amount date from December 9, 2021 to September 6, 2022.[14]  (D. 44-11).  FXI contends in the letter that, in reaching this figure, it reconciled and validated all of the "quality claims" Shawmut made and applied them to the balance owed.  (D. 44-11).  Shawmut has not paid this amount.  (D. 44-2, p. 260).

Importantly, Shawmut does not agree with the amount owed. Specifically, Shawmut's Rule 30(b)(6) deponent testified that she did not agree with the amounts in the Excel spreadsheet.[15]

---

[14] As previously indicated, FXI's counterclaim alleges that Shawmut breached the Supply Agreement by not paying FXI for products FXI provided to Shawmut between December 9, 2021 and September 6, 2022.

[15] The colloquy was as follows:

Q.  Why has Shawmut not paid the amounts listed on the spreadsheet . . .?

A.  We are not in agreement that this is accurate.

(D. 44-2, p. 260).

## V.    DISCUSSION

### A.    Shawmut's Breach Of Contract Claim

### 1.    Product Defect Claims

As noted, FXI argues that Shawmut fails to provide expert testimony that the foam was defective and that any defect caused Shawmut damages.  Shawmut responds, in part, that the color and thickness of the foam does not require expert testimony.  According to FXI, Shawmut's spoliation also warrants summary judgment on the product defect breach of contract claim.  Shawmut submits that FXI had the opportunity to inspect the foam and was advised that the foam would be destroyed.

### a.    Expert Testimony

Expert testimony is "not required if jurors can rely on their common knowledge to understand the facts in dispute." *Berezin v. FCA US, LLC*, Civil Action No. 21-10852-FDS, 2023 WL 8283870, at *3 (D. Mass. Nov. 30, 2023) (citations omitted).  Simply put, when the jury's lay knowledge enables it "to find the relevant facts," expert testimony is not necessary. *Smith v. Ariens Co.*, 377 N.E.2d 954, 957 (Mass. 1978).  Thus, in *Smith*, it was "within the knowledge of a jury" that "unshielded metal protrusions on the handlebar of a snowmobile" was a design defect. *Id.* at 957-958. Likewise, if causation between a defect and resulting damages is within the common knowledge of the jury, expert testimony is not

necessary. *See Petchel v. Collins*, 796 N.E.2d 886, 889-890 (Mass. App. Ct. 2003) (collecting cases).

Here, discoloration of the foam would be visible. (D. 47-1, p. 4) (pictures of discolored foam). Furthermore, coloration falls within the common knowledge of a jury. *See Commonwealth v. Silva*, 121 N.E.3d 1266, 1275 (Mass. 2019) (rejecting "argument that 'more than common knowledge was required' to analyze . . . images" as "belied by the absence of any expert testimony about digital image coloration at trial"); *BASF Corp. v. Sublime Restorations, Inc.*, 880 F. Supp. 2d 205, 218 (D. Mass. 2012) (whether "paint and paint equipment produced mixed paint that matched the samples" fell within "common knowledge of a reasonable juror and" could "be decided without" expert opinion) (citing *Smith*, 377 N.E.2d at 957-958) (additional citations omitted). What is more, the discoloration on the laminate as well as the scorched yellowed color, presumably of the foam, caused Shawmut damages. (D. 44-12). It does not take an expert to testify that damages result when the foam does not comport with the required color with the effect being a visual defect in the headliner. (D. 44-12, p. 13) (defining scorched as foam exhibiting yellow color rather than approved color; and the effect as a visual defect in the headliner); *see also* (D. 44-2, p. 13) (defining discoloration as changes in standard color with the effect as a visual defect in the headliner); (D. 44-12, p. 12) (identifying discoloration on

laminate and scorched foam as amounting to $7,288.22 damages to Shawmut); (D. 44-2, pp. 92-95).

As to thickness, it is subject to measurement. *See generally* (D. 44-12, p. 20).  The nonconforming thickness of foam in the composite laminate caused Shawmut damages, specifically $447.88. (D. 44-2, pp. 63, 215) (D. 44-12, p. 12).  In any event, FXI did not identify thickness as subject to expert testimony in its supporting memorandum.  More notably, after Shawmut identified thickness as not subject to expert testimony, FXI failed to address it in either its reply brief or post-hearing memorandum.  FXI therefore waived the argument that expert testimony is required to show thickness.  *See Duval v. United States Dept. of Veterans Affairs*, 69 F.4th 37, 45 n.5 (1st Cir. 2023) (deeming "argument waived for lack of development").

Per the foregoing, FXI's expert testimony argument fails to persuade.

## b. <u>Spoliation</u>

"[S]poliation is the intentional, negligent, or malicious destruction of relevant evidence." *Johnson v. Cashman Dredging and Marine Contracting Co., LLC*, 2024 WL 5170265, at *1 (D. Mass. 2024) (quoting *Gordon v. DreamWorks Animation SKG, Inc.*, 935 F. Supp. 2d 306, 313 (D. Mass. 2013)).  The court will assume arguendo that Shawmut intentionally or negligently destroyed the foam that was discolored or lacked the required thickness.  Nonetheless,

FXI's requested sanction to dismiss Shawmut's claims is too extreme.

To begin, the parties agree that the choice of sanction involves:

> weigh[ing] the following, or similar, factors: (1) whether the defendant was prejudiced as a result of [the destruction of the evidence]; (2) whether the prejudice can be cured; (3) the practical importance of the evidence; (4) whether the plaintiff was in good faith or bad faith; and (5) the potential for abuse if the evidence is not excluded.

*Townsend v. Am. Insulated Panel Co., Inc.*, 174 F.R.D. 1, 4 (D. Mass. 1997); (D. 42, p. 11) (FXI's brief quoting *Townsend*, 174 F.R.D. at 4); (D. 46, p. 17) (Shawmut's brief quoting *Townsend*, 174 F.R.D. at 4). First and foremost, Shawmut did not act in bad faith in destroying the foam at issue. Its standard SQN denotes a policy of scrapping the foam if FXI did not respond to an SQN in seventy-two hours. *See United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010) (routine erasure of videotape surveillance tape after substantial period of time elapsed did not infer "tape was destroyed because it contained evidence favorable to the defendant") (citing *Pimentel v. Jacobsen Fishing Co.,* 102 F.3d 638, 640 n.1 (1st Cir. 1996)); *see also Pimentel*, 102 F.3d at 640 n.1 (upholding "trial judge's refusal to draw an adverse inference" from "inadvertent destruction of evidence") (citation omitted).

More, whereas FXI will be prejudiced by not being able to examine the foam, the prejudice is mollified because Shawmut has

maintained detailed records of all of the defective product claims at issue in this case.  (D. 47, ¶ 19).  To be sure, the destroyed foam has practical importance, but the importance is outweighed by the lack of bad faith and the mollified prejudice.

Lastly, the "goals behind excluding evidence, or at the extreme, dismissing a complaint, are to rectify any prejudice the non-offending party may have suffered as a result of the loss of evidence and to deter any future conduct, particularly deliberate conduct, leading to such loss of evidence." *Sharp v. Hylas Yachts, LLC*, 872 F.3d 31, 42 (1st Cir. 2017) (citation omitted).  Because of the "'prefer[ence] that adjudications be driven by the merits of a case,' dismissal should be granted only in extreme cases." *Id.* (citations omitted).  This is not an extreme case.  The prejudice is also far from overwhelming.

## 2.  Closure Of ER Facility

It is important to note that Shawmut raises the product defect claims and the closure of the ER facility claim in a single breach of contract count.[16]  Hence, the survival of the product defect claims means that count I remains in this action irrespective of

---

[16] The complaint also includes the closure as a breach of the duty of good faith claim in count II.  FXI, however, does not develop an argument that this claim is subject to summary judgment.  *See Duval*, 69 F.4th at 45.  Indeed, FXI simply asserts that it fulfilled its contractual obligations and Shawmut cannot recover on the duty of good faith claim.  (D. 42, p. 19, n.3).  As such, summary judgment is inappropriate on this claim.

the merits of the closure of the ER facility as a breach.  As a result, it is not necessary to address FXI's arguments seeking summary judgment on the aspect of count I that FXI breached the Supply Agreement by closing the ER facility.

Although the court could thus end the analysis at this juncture, the court will address the alleged termination of the Supply Agreement and FXI's waiver and modification arguments in the interest of thoroughness.  FXI maintains that even if the Supply Agreement obligated it to pay Shawmut's closure damages, the parties modified or Shawmut waived any such obligation.[17]

### a.  <u>Termination</u>

Overall, a genuine issue of material fact exists as to whether FXI terminated the Supply Agreement in compliance with the termination provision.  Where, as here, an agreement includes a termination provision, strict compliance is required.  *Univ. Emergency Med. Found. v. Rapier Invs., Ltd.*, 197 F.3d 18, 20 (1st Cir. 1999) (If agreement includes a termination provision, "a rule of *strict compliance* traditionally applies.") (citation omitted).  A termination notice does not need to include the word termination.

---

[17] More broadly, FXI submits that Shawmut modified or waived *any* obligation of FXI other than its obligation to fulfill Shawmut's releases.  Because FXI does not identify what those obligations are, the court declines to do so.  *See In re Buscone*, 634 B.R. 152, 167 (B.A.P. 1st Cir. 2021) ("Judges are not expected to be mindreaders" and "a litigant has an obligation 'to spell out its arguments squarely and distinctly' or else forever hold its peace.'") (citation omitted); *see also Duval,* 69 F.4th at 45 n.5.

*See New England Carpenters Central Collection Agency v. Labonte Drywall Co., Inc.*, 795 F.3d 271, 278-279 (1st Cir. 2015).

As noted, the termination provision required that Shawmut receive a written termination notice ninety days before the end of the current term. FXI's written communications, however, addressed the planned closure. They did not, at least not directly, address a termination of the Supply Agreement. FXI also did not send a termination notice ninety days prior to the end of the current term. That term ended on September 30, 2021.[18] Ninety days prior thereto was June 30. The record is devoid of evidence that FXI sent a termination notice on or before June 30.

Thus, construing the record in Shawmut's favor, the Supply Agreement was not terminated in accordance with the termination provision. Hence, the issue reduces to whether the parties orally or through their conduct modified the agreement or Shawmut waived its rights under the agreement regarding any obligation that FXI pay Shawmut's closure damages.

**b.  Modification And Waiver**

Continuing forward, the Supply Agreement required modifications and waivers to be in writing. (D. 44-3, § 6.g.) ("No amendment, modification, or waiver hereunder shall be valid

---

[18] The current term was not the subsequent term that ended on September 30, 2022. By that time, Shawmut had filed this lawsuit. Moreover, a notice sent on June 30, 2022 would not have terminated the agreement prior to the purported breach of FXI closing the ER facility.

or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, or waiver is sought."). Under Massachusetts law, however, "a contractual provision requiring modifications or waivers to be in writing does not prevent the parties from making such changes orally or through their conduct."[19] *Bachorz v. Miller-Forslund*, 703 F.3d 27, 33 (1st Cir. 2012).

The court addresses modification and waiver seriatim. "Under Massachusetts law, the parties to a contract must agree to a modification." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 9 (1st Cir. 2003) (citation omitted). A "[m]utual agreement on modification . . . may . . . 'be inferred from the conduct of the parties and from the attendant circumstances[.]'" *Cambridgeport Sav. Bank v. Boersner*, 597 N.E.2d 1017, 1022 (Mass. 1992) (citation omitted); *accord Sea Breeze Estates, LLC v. Jarema*, 113 N.E.3d 355, 362 (Mass. App. Ct. 2018) ("[A]greement to modify a contract may be . . . inferred from the attendant circumstances and conduct of the parties.") (citation omitted). As explained, Shawmut's requests for additional foam in response to FXI's notices of the planned closure were an attempt to create a cushion of inventory as part of its bank build efforts. Moreover, Shawmut did not discuss with FXI modifying the agreement to eliminate any

---

[19] Massachusetts law applies because of a choice of law clause in the Supply Agreement. (D. 44-3, § 6.h.).

obligation by FXI to pay for Shawmut's closure damages. Concordantly, Shawmut did not discuss modifying the agreement to allow the closure.  At most, in Shawmut's October 11 email seeking foam to meet its customers' needs, Shawmut politely wrote that it "respect[ed] [FXI's] business decision to exit [the ER] facility." (D. 44-9, p. 10).  Further, it is difficult to infer that Shawmut accepted a modification eliminating any obligation by FXI to pay Shawmut its closure damages, which exceeded $700,000.  Per the foregoing, a genuine issue of material fact exists as to whether Shawmut agreed to modify the Supply Agreement to eliminate any such payment obligation.

Next, "A waiver inferred from a party's conduct must be 'clear, decisive, and unequivocal.'" *Sparta Ins. Co. v. Pa. Gen. Ins. Co.*, Civil Action No. 21-11205-FDS, 2025 WL 2785033, at *9 (D. Mass. Sept. 30 2025) (citation omitted); *KACT, Inc. v. Rubin*, 819 N.E.2d 610, 616 (Mass. App. Ct. 2004) ("[W]here waiver is not explicit, it must be premised on 'clear, decisive and unequivocal conduct'").  The same reasons that create a genuine issue of material fact as to modification likewise do so as to waiver. Shawmut's communications were neither decisive nor unequivocal that it was waiving any obligation of FXI to pay Shawmut's closure damages or its objections to the closure.  Under the circumstances, the import and reasonable inference of Shawmut's communications was to build an inventory to transition to a new supplier.

In sum, genuine issues of material fact exist as to both modification and waiver. Summary judgment on the closure of the ER facility as a breach of the Supply Agreement is not persuasive.

**B.  FXI's Counterclaims**

It is readily evident that a genuine issue of material fact exists on FXI's breach of contract claim. That claim asserts that Shawmut breached the Supply Agreement by not paying an outstanding balance for products FXI supplied to Shawmut between December 9, 2021 and September 6, 2022. (D. 8, p. 11, ¶¶ 12-13, 15-20). In that regard, FXI sent Shawmut the September 22, 2022 letter requesting payment in full of the amounts owed, namely, $58,066.65. (D. 8, p. 11, ¶¶ 14-20) (D. 44-11).

Fundamentally, Shawmut does not agree that it owed FXI the amount FXI alleges Shawmut owes. Although Shawmut has not paid the amount asserted in the letter, Shawmut is not in agreement that the amount is accurate. The testimony of Shawmut's Rule 30(b)(6) deponent establishes this genuine and material dispute. As such, summary judgment on the breach of contract counterclaim is inadvisable.

Finally, FXI makes no developed argument regarding the duty of good faith and unjust enrichment counterclaims. As such, FXI is not entitled to summary judgment because it did not satisfy its burden on summary judgment. Regardless, it also waived any

argument that it is entitled to summary judgment on these claims.
*See Duval*, 69 F.4th at 45 n.5.

**VI.**   **CONCLUSION**

In accordance with the foregoing discussion, FXI's motion for summary judgment (D. 41) is **DENIED**.

/s/ Donald L. Cabell
DONALD L. CABELL, Ch. U.S.M.J.

DATED:  September 30, 2025